# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

John William Long,
    Petitioner,

    vs.

Case No. 1:06cv787
(Barrett, J.; Hogan, M.J.)

Warden, Warren Correctional
Institution,
    Respondent.

## REPORT AND RECOMMENDATION

Petitioner, an inmate in state custody at the Warren Correctional Institution in Lebanon, Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition contains six grounds for relief challenging petitioner's 2004 murder conviction in the Hamilton County, Ohio, Court of Common Pleas. (Doc. 7). In the initial return of writ filed in answer to the petition, respondent only addressed the merits of petitioner's first ground for relief and contended that petitioner's remaining claims are waived. (*See* Doc. 11). Petitioner filed a "traverse" in reply to the return of writ, arguing in part that petitioner had not procedurally defaulted the ineffective assistance of appellate counsel claim alleged in Ground Two of the petition and as "cause" for his procedural default of the claims alleged in Grounds Three through Six of the petition. (Doc. 13).

Upon initial review of the petition, return of writ and petitioner's "traverse" brief (Docs. 7, 11, 13), the undersigned issued an Order on September 18, 2008 rejecting respondent's contention that "all but one of petitioner's claims are waived in light of the Ohio Court of Appeals' reliance on the state *res judicata* doctrine in denying petitioner's timely-filed reopening application." (Doc. 18, p. 2). The Order provided in pertinent part:

> The Ohio Supreme Court has ... made it clear [in *State v. Davis,* 894 N.E.2d 1221 (Ohio 2008),] that the state *res judicata* doctrine is inapplicable in a case such as this, where the petitioner filed a timely

reopening application under Ohio R. App. P. 26(B) and petitioner's ineffective assistance of appellate counsel claims [alleged in Ground Two of the petition and as "cause" for his procedural default of Grounds Three through Six] have not been considered on the merits by the state supreme court. Accordingly, the doctrine does not constitute an "adequate and independent" state ground which precludes a merit-based review of petitioner's grounds for relief alleged in Grounds Two through Six of the petition.

(*Id.,* p. 4). Because it thus appeared that the claims alleged in Grounds Two through Six "may be subject to review on the merits," respondent was ordered to submit a supplemental return of writ addressing the merits of each of those claims. (*Id.*).

At this juncture, it appears that the instant case is now ripe for final adjudication. Presently pending before the Court for ruling are the petition (Doc. 7); respondent's return of writ and supplemental return of writ filed on February 2, 2009 in accordance with the September 18, 2008 Order (Docs. 11, 29); and petitioner's "traverse" brief in reply to the return of writ, as well as his reply to the supplemental return of writ filed on March 13, 2009 (Docs. 13, 32). In addition, petitioner has filed a motion to amend the petition to add two more claims as grounds for relief (Doc. 22); respondent opposes this motion (Doc. 25), and petitioner has replied to respondent's opposition memorandum (Doc. 28).[1]

## Factual And Procedural Background

On April 13, 2004, the Hamilton County, Ohio, grand jury returned a one-count indictment charging petitioner with the murder of Amerrintha Spikes in violation of Ohio Rev. Code § 2903.02(A). (Doc. 11, Ex. 1). After a jury trial, petitioner was found guilty as charged. (*See id.,* Ex. 2; Ex. 22, Tr. 947). On September 21, 2004, petitioner was sentenced to a prison term of fifteen (15) years to life. (*Id.,* Ex. 2).

With the assistance of new counsel, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. In the appellate brief filed by counsel, two assignments of error were presented:

---

[1]On October 15, 2008, petitioner also filed a motion to expand the record "to include ... additional attached evidentiary items." (Doc. 19). The unopposed motion has been granted by separate Order issued this date. Therefore, the attachments to the motion are deemed part of the record subject to review by this Court in considering petitioner's claims for relief herein.

1. Appellant was denied the effective assistance of counsel [when his trial attorney failed to object to damaging hearsay statements from Cincinnati Police Officer Jennifer Luke].

2. The evidence was insufficient as a matter of law and/or against the manifest weight of the evidence to sustain appellant's conviction for murder.

(*Id.*, Ex. 3, pp. 10-11).

On October 26, 2005, the Court of Appeals overruled the assignments of error and affirmed the trial court's judgment. (*Id.*, Ex. 5). In its decision, the state appellate court made the following factual findings, which are presumed correct under 28 U.S.C. § 2254(e)(1),[2] regarding the incident resulting in petitioner's conviction:

On August 1[8], 2003, Cincinnati police officers responded to an emergency call from Livingston Street. After being directed to a warehouse dock by two witnesses, the officers found the body of Amerrintha Spikes. Spikes had been stabbed eight times. The witnesses–Petrina Crawford and Shalese Gilmore–told the police officers that they had seen a black male running from the scene. The man was carrying a red shirt and was pulling up his denim shorts. The man had run down a nearby alley.... Crawford later picked Long's photograph out of a police lineup.

Police officer Iris Kelly had reported to the scene to secure the area. While there she was approached three times by a man whom she later identified as Long. According to Kelly, Long asked many questions

[2]Specifically, 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has contested the Ohio Court of Appeals' factual finding that eyewitness Shalese Gilmore identified petitioner as the man she saw running from the crime scene. (*See* Doc. 13, p. 1). Gilmore, who was in a nursing home at the time of the trial as a result of injuries incurred in a severe beating, did not testify at trial. Therefore, as petitioner has contended, no evidence was introduced that Gilmore actually identified petitioner, but only that she was shown a photo spread containing petitioner's photograph. (*See* Doc. 11, Ex. 22, Tr. 565-66). Accordingly, the contested factual finding has been removed from the undersigned's statement of facts, as quoted from the state appellate court's opinion.

about the crime and seemed unusually interested in it.

> When police officers were searching the area near the crime scene, they found a pair of denim shorts in the alley down which Crawford and Gilmore had said the assailant had run. Inside the pocket of the denim shorts was a receipt for a bus ticket that listed John Long as a passenger. Forensic tests later revealed that Spikes's blood was on the shorts, and a mixture of DNA that could have been Long's and Spikes's was on the waistband of the shorts.

(*Id.,* pp. 1-2).

Petitioner filed a timely *pro se* appeal from this decision to the Ohio Supreme Court, alleging as propositions of law the same two claims that had been asserted as assignments of error on direct appeal. (*See id.,* Ex. 6). On March 8, 2006, the state supreme court declined jurisdiction to hear the case and summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. 8).

In the meantime, on January 10, 2006, while his appeal was pending before the Ohio Supreme Court, petitioner filed a timely *pro se* application for reopening of the direct appeal pursuant to Ohio R. App. P. 26(B) with the Ohio Court of Appeals, First Appellate District. (*Id.,* Ex. 9).[3] In the application, as later supplemented, petitioner claimed his appellate counsel was ineffective in failing to raise five assignments of error challenging (1) certain hearsay testimony by Cincinnati police officers Coombs and Luke; (2) trial counsel's failure to object to the admission of State Exhibits 38 and 44; (3) the admission of State Exhibit 35 over defense counsel's objection; (4) the trial's fairness based on "cumulative error;" and (5) trial counsel's failure to object to "inadmissible 'other acts' evidence and improper impeachment evidence." (*Id.* & Exs. 11, 14).

On April 3, 2006, the Ohio Court of Appeals denied the reopening application. As discussed above and in the September 18, 2008 Order (Doc. 18), the state appellate court did not address the merits of petitioner's ineffective assistance of appellate

---

[3]Soon after filing the reopening application, petitioner filed a motion with the Ohio Supreme Court requesting that court to "postpone making a ruling on Appellant's discretionary appeal until the First District Court of Appeals enters a decision on [the] Application for Reopening." (Doc. 11, Ex. 7). In its March 8, 2006 Order declining jurisdiction to hear the discretionary appeal from the Ohio Court of Appeals' direct appeal decision, the state supreme court also denied the motion for stay "as moot." (*Id.,* Ex. 8).

counsel claim, but rather held that "res judicata precludes reopening the appeal on the proposed bases" because the "proposed assignments of error present challenges that Long could raise in his appeal to the Ohio Supreme Court." (Doc. 11, Ex. 15).

Petitioner timely appealed to the Ohio Supreme Court. (*Id.*, Ex. 16). On August 2, 2006, the Ohio Supreme Court dismissed the appeal "as not involving any substantial constitutional question." (*Id.*, Ex. 17).

The instant federal habeas corpus petition was officially filed in March 2007. (*See* Doc. 7). The petition sets forth six grounds for relief:

**Ground One:** The evidence adduced at Petitioner[']s trial was constitutionally insufficient to sustain his conviction for murder.

**Ground Two:** Ineffective assistance of appellate counsel.

**Ground Three:** The State of Ohio improperly admitted testimonial out-of-court statements [of Shalese Gilmore] to [the] jury, violating Petitioner[']s 6th and 14th Amendment rights.

**Ground Four:** Petitioner[']s 6th and 14th Amendment rights were violated by the hearsay testimony of police officers Coombs and Luke.

**Ground Five:** Petitioner was denied the right to effective assistance of trial counsel, in violation of 6th and 14th Fourteenth Amendments, when counsel failed to object to the inadmissible "other acts" evidence, and improper impeachment evidence that was elicited by the State of Ohio during trial.

**Ground Six:** The trial court committed plain error when Exhibit #38 was permitted to be entered as evidence because this exhibit contained out-of-court statements of Sh[a]l[e]se Gilmore, and this error violated Petitioner's 6th and 14th Amendment rights.

(*Id.*, pp. 6, 7, 9, 11, 14, 15).

Respondent does not argue, nor does it appear, that the petition is barred from review on statute of limitations grounds. In the return of writ and supplemental return of writ, respondent has addressed the merits of each of petitioner's claims for relief.

(Docs. 11, 29). In the supplemental return of writ, respondent also argues that petitioner has waived the claims alleged in Grounds Three and Six, because he never raised these claims to the state courts even as examples of appellate counsel's ineffectiveness in his reopening application. (Doc. 29, pp. 2). Finally, respondent contends that the claims alleged in Grounds Four and Five are waived because the ineffective assistance of appellate counsel claim alleged as "cause" for petitioner's failure to raise those claims on direct appeal lacks merit. (*Id.*).

Petitioner has filed a motion to amend the petition to add the following two claims as grounds for relief:

1. The State of Ohio and/or it[]s agents intentionally suppressed exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and this resulted in a manifest miscarriage of justice, as well as a violation of the Fourteenth Amendment.

2. The Cincinnati police mishandled and/or tampered with material evidence and this altered the probative value of this evidence, thus violating petitioner's Fourteenth Amendment rights to due process and prevented petitioner from receiving a fair trial.

(Doc. 22). Respondent opposes the motion on the ground that the additional claims are barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d), as amended by § 101 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214; alternatively, respondent contends that these claims are procedurally defaulted. (Doc. 25).

## OPINION

### A. Petitioner's Motion To Amend (Doc. 22) Should Be Denied As Futile, Because The Two Newly Asserted Claims Are Time-Barred And Do Not Relate Back To Claims Alleged In The Original Petition

Petitioner filed the pending motion to amend the petition to add two new grounds for habeas relief in December 2008, over a year and one-half after respondent filed a return of writ in May 2007 responding to the original petition filed in March 2007, and after the undersigned conducted an initial review of the case only to determine that a supplemental return of writ was required. Although the original

6

petition was timely filed, petitioner concedes, as he must, that he filed his motion to amend long after the expiration of the applicable one-year statute of limitations set forth in 28 U.S.C. § 2244(d). (*See* Doc. 28, p. 3). He contends, however, that he should be allowed to amend the petition at this late juncture because under Fed. R. Civ. P. 15, the two new claims "relate back" to the date the petition was originally filed; he further appears to argue that the proposed amendment is permissible to prevent a "fundamental miscarriage of justice," because the two new claims are important to develop "the factual basis of his central claim– and that being that he is 'actually innocent' of the [murder] offense." (*Id.*, pp. 2-5).

Fed. R. Civ. P. 15, which governs pleading amendments in civil cases, is applicable to federal habeas corpus proceedings. *Mayle v. Felix,* 545 U.S. 644, 655 (2005). The rule provides in relevant part that after a responsive pleading is served, a party may amend his pleading "only by leave of court," which "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *see also Rodriguez v. United States,* 286 F.3d 972, 980 (7ᵗʰ Cir.), *cert. denied,* 537 U.S. 938 (2002); *Oleson v. United States,* 27 Fed.Appx. 566, 569 (6ᵗʰ Cir. Dec. 14, 2001) (not published in Federal Reporter). The factors that the court should consider in determining whether to grant leave to amend include "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, *and futility of amendment*." *Coe v. Bell,* 161 F.3d 320, 341 (6ᵗʰ Cir. 1998) (quoting *Brooks v. Celeste,* 39 F.3d 125, 130 (6ᵗʰ Cir. 1994)) (emphasis added), *cert. denied,* 528 U.S. 842 (1999); *see also Oleson,* 27 Fed.Appx. at 569.

Courts have interpreted Rule 15(a) "as setting forth a 'liberal policy of permitting amendments to ensure the determination of claims on their merits.'" *Oleson,* 27 Fed.Appx. at 569 (quoting *Marks v. Shell Oil Co.,* 830 F.2d 68, 69 (6ᵗʰ Cir. 1987), in turn quoting *Tefft v. Seward,* 689 F.2d 637, 639 (6ᵗʰ Cir. 1982)). Under this liberal standard, a party's delay in seeking an amendment is not sufficient reason standing alone to deny the motion to amend. *Id.; see also Coe,* 161 F.3d at 341 ("Delay by itself is not sufficient reason to deny a motion to amend.") (quoting *Brooks,* 39 F.3d at 130). Instead, "[n]otice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Coe,* 161 F.3d at 341-42 (quoting *Brooks,* 39 F.3d at 130).

In this case, respondent has relied on the "futility of amendment" factor in arguing that petitioner's motion should be denied because the new claims he seeks to

add as grounds for relief are time-barred. (*See* Doc. 25). The United States Court of Appeals for the Sixth Circuit has held that "a motion to amend a habeas corpus action to include 'entirely new arguments' filed after the statute of limitations has expired is futile" because "such claims do not relate back to the date the initial habeas petition was filed." *See Guzman v. Houk,* No. 2:04cv194, 2006 WL 1064052, at *6 (S.D. Ohio Apr. 20, 2006) (Marbley, J.) (unpublished) (citing *Oleson,* 27 Fed.Appx. at 570); *see also Wiedbrauk v. Lavigne,* 174 Fed.Appx. 993, 998-1001 (6th Cir. May 17, 2006) (not published in Federal Reporter) (affirming the denial of a habeas petitioner's motion to amend on ground of "futility" because newly asserted time-barred claims were either procedurally defaulted or failed to "relate back" to the original petition), *cert. denied,* 549 U.S. 961 (2006).

Under Fed. R. Civ. P. 15(c), an otherwise time-barred amendment to a pleading is permitted only if it "relates back to the date of the original [timely] pleading." Relation back occurs when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). The Supreme Court has clarified that in the context of federal habeas proceedings governed by the AEDPA's one-year statute of limitations, an amendment to the petition to add untimely claims is permitted under Fed. R. Civ. P. 15(c)(2) only when the proposed claims "arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." *Mayle,* 545 U.S. at 657. In other words, "[a]n amended petition ... does not relate back (and thereby escape the AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650; *see also Wiedbrauk,* 174 Fed.Appx. at 1001-02.

Here, petitioner asserts for the first time that (1) the State withheld material exculpatory forensic evidence and eyewitness testimony from the defense in violation of *Brady*; and (2) the Cincinnati police mishandled or tampered with "material evidence (i.e. blue jean shorts, Trial Exhibit #37)," which was introduced against him at trial. (*See* Doc. 22). As respondent has pointed out (*see* Doc. 25, pp. 4-5), petitioner's new grounds for relief are supported by facts differing in both time and type from those set forth in the original petition challenging the sufficiency of evidence; appellate and trial counsel's performance; and the admission of certain hearsay evidence.

Petitioner has suggested in his reply to respondent's opposition memorandum that his new claims of prosecutorial and investigatory misconduct relate back to the sufficiency of evidence claim alleged in the original petition, particularly given that he

filed motions for discovery in the instant case prior to filing the petition. (Doc. 28, pp. 4-5). The undersigned rejects the contention that petitioner's new claims rise from the same core facts as the sufficiency of evidence claim alleged in the original petition.[4] In assessing the merits of a sufficiency of evidence claim, the court examines only the trial transcript; "the relevant question is whether, after viewing the evidence [admitted at trial] in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). In contrast, petitioner's new claims turn on evidence outside the trial record pertaining to the earlier pretrial investigatory and discovery phases of petitioner's criminal prosecution. The allegations of police and prosecutorial misconduct also are of a different "type," involving an assessment as to (1) whether or not evidentiary items were withheld or mishandled; and (2) if so, whether any mishandling of evidence deprived petitioner of a fair trial, or any withheld evidence amounted to proscribed *Brady* material that was both favorable to the accused and material to guilt or punishment. *See Brady v. Maryland,* 373 U.S. 83, 87 (1963); *see also Pennsylvania v. Ritchie,* 480 U.S. 39, 57 (1987) (plurality opinion); *United States v. Bagley,* 473 U.S. 667, 674 (1985).

Therefore, the undersigned concludes that petitioner's newly asserted time-barred claims do not relate back to the date of filing of the original petition, as required under Fed. R. Civ. P. 15(c)(2) to overcome the statute of limitations bar.

Nor has petitioner demonstrated that the otherwise time-barred claims are subject to review on the merits based on a colorable showing of his "actual innocence." In *Souter v. Jones,* 395 F.3d 577, 599 (6th Cir. 2005), the Sixth Circuit, following *Schlup v. Delo,* 513 U.S. 298 (1998), held that "equitable tolling of the one-year limitations period based on a credible showing of actual innocence is appropriate." The *Souter* court stated that "where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims." *Souter,* 395 F.3d at 602. To

---

[4]*Cf. Smithson v. Adams,* No. CIV S-01-1373GEBDADP, 2007 WL 334005, at *11-12 (E.D. Cal. Jan. 31, 2007) (Report & Recommendation) (unpublished) (denying motion to amend petition to raise new time-barred claims, which included a claim that the "prosecution failed to disclose exculpatory information regarding a witness's statement that petitioner's co-defendant admitted killing the victim," because they did not relate back to claims alleged in the original petition, which included a claim challenging the sufficiency of evidence for the felony murder conviction), *adopted,* 2007 WL 704999 (E.D. Cal. Mar. 6, 2007) (unpublished).

make the necessary showing, petitioner must support his allegations of constitutional error "with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup,* 513 U.S. at 324.

Petitioner has made no such showing in this case. Although petitioner has alleged that the evidence presented at trial was insufficient to establish he was guilty of murder, establishing a colorable claim of actual innocence requires a showing of factual innocence, not mere legal insufficiency. *Bousley v. United States,* 523 U.S. 614, 623 (1998); *Hampton v. United States,* 191 F.3d 695, 703 (6th Cir. 1999). Moreover, to the extent petitioner contends that the proposed new claims may assist in developing a factual basis for his "central claim" of actual innocence, his conclusory, unsubstantiated and speculative allegations are insufficient to establish that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt" on the murder charge. *See Souter,* 395 F.3d at 602.

Accordingly, in sum, because petitioner's newly proposed grounds for relief are time-barred and do not relate back to the original petition, and because petitioner has not demonstrated that he is entitled to equitable tolling of the statute of limitations based on a colorable showing of "actual innocence," the undersigned concludes that granting leave to amend would be futile in this case.[5] Petitioner's motion under Fed. R. Civ. P. 15 to amend the petition (Doc. 22) should be **DENIED.** *Cf. Coe,* 161 F.3d at 341 (quoting *Brooks,* 39 F.3d at 130); *see also Wiedbrauk,* 174 Fed.Appx. at 1001-02; *Oleson,* 27 Fed.Appx. at 569.

## B. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground One Challenging The Sufficiency Of Evidence For His Murder Conviction

In Ground One of the petition, petitioner alleges that he is entitled to habeas corpus relief because the evidence was insufficient to establish beyond a reasonable doubt that he was the "perpetrator of the [murder] offense." (Doc. 7, p. 6). This claim,

---

[5]Alternatively, as respondent has contended (Doc. 25, pp. 5-6), it appears that another significant bar to review exists because petitioner has never presented the two new proposed claims to the state courts for consideration. Petitioner has not demonstrated "cause" for this procedural default in the state courts, and as discussed above, has not shown that he is entitled to review of the claims to prevent a fundamental miscarriage of justice based on a colorable claim of actual innocence. Therefore, it appears the petitioner has waived the claims, which constitutes another ground for denying leave to amend based on the "futility of amendment." *Cf. Wiedbrauk,* 174 Fed.Appx. at 1000-01.

which was presented to both the Ohio Court of Appeals and the Ohio Supreme Court on direct review, is subject to review on the merits.

The Ohio Court of Appeals was the only state court to address petitioner's claim challenging the sufficiency of evidence. Citing state case-law, the court overruled petitioner's claim of error, stating only that "[t]he state presented adequate evidence of each element of the offense of murder." (Doc. 11, Ex. 5, p. 3).

The Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship*, 397 U.S. 358, 363-64 (1970). In determining whether or not the evidence presented at trial was sufficient to satisfy this due process standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

This standard does not require the State to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, under this standard, the reviewing court "faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir.), *cert. denied*, 464 U.S. 951, 962 (1983). It is the jury's responsibility as the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the trier of fact which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988) (per curiam), *cert. denied*, 490 U.S. 1049 (1989).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000)). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Id.* at 796-97 (and Sixth Circuit cases cited therein); *see also United States v. Slewa*, No. 06-20519, 2008 WL 5244353, at *6 (E.D. Mich. Dec. 16, 2008) (unpublished).

Petitioner was charged with murder under Ohio Rev. Code § 2903.02(A), which

provides in pertinent part that "[n]o person shall purposely cause the death of another." Under Ohio law, a person acts "purposely" when "it is his specific intention to cause a certain result." Ohio Rev. Code § 2901.22(A). Here, petitioner has not disputed that the victim, who died from multiple stab wounds, was murdered. (*See* Doc. 11, Ex. 3, pp. 12-15; Ex. 6, pp. 11-15). Petitioner posits, however, that the State failed to prove beyond a reasonable doubt that he was the perpetrator of the offense. (*See id.*; *see also* Doc. 13, pp. 3-19). Upon review of the trial transcript, and after viewing the evidence in the light most favorable to the prosecution, the undersigned concludes that a rational juror could have found beyond a reasonable doubt that petitioner was guilty of the charged murder offense.

The following evidence was introduced at trial to establish petitioner's connection with the crime scene and identity as the victim's assailant. Petrina Crawford, who was present in the area with two other women at the time of the victim's murder, testified at trial that she heard a woman screaming for help. (Doc. 11, Ex. 22, Tr. 373-75). Crawford and her companions, Melissa Howell and Shalese Gilmore, were standing at the time in front of a supermarket located at the corner of John and Livingston Streets in an area of Cincinnati known for prostitution; after hearing the screams, the women crossed the street "to go over there," but Howell suddenly ran off and Crawford had to grab Gilmore to keep her from running off as well. (*Id.*, Tr. 374, 404-05, 424-26). Crawford told Gilmore to call 911 from a phone booth in front of the supermarket. (*Id.*, Tr. 376).

Crawford testified that while Gilmore was on the phone, she did not walk any farther toward a factory loading dock, where the screams were heard, but stopped at a pole. (*Id.*, Tr. 376-78, 404, 406-07). She then observed a man she had seen a number of times before in that same area suddenly come running out, down a ramp and "off that dock and f[a]ll [on his knees] in the middle of the street." (*Id.*, Tr. 379-84, 408). Crawford identified petitioner as the man she saw fleeing the scene;[6] she testified:

---

[6]Crawford testified that she and many of her prostitute friends knew petitioner, who previously had solicited their services. (Doc. 11, Ex. 22, Tr. 398). Crawford said she saw petitioner every day for over a year in that area, where he lived outside by a wall or in trucks parked on Central Avenue. (*Id.*, Tr. 382, 398-99). She said petitioner "had dreads then" and carried a back pack. (*Id.*, Tr. 396-97). She also said that a few days before the victim's murder, petitioner asked her to "engage in prostitution" with him. (*Id.*, Tr. 396). Crawford refused and told petitioner to get away from her. (*Id.*). She said that "[s]omething wasn't right with him" and that she "didn't trust him." (*Id.*, Tr. 383-84). After the victim's murder, Crawford never saw petitioner in that area again. (*Id.*, 400-01).

And then that guy right there, he shot off there and ripped past me. He fell. He didn't have no clothes on. He just had on a pair of gym shoes. He dropped something and a red shirt; he bent down, picked it up. As he got up, he looked up and said, "Bitch, you are dead anyway[,]" and ran off toward Central by the trucks, before Central, by the trucks.

(*Id.,* Tr. 376-77, 390). Crawford said petitioner appeared "bald," although in the past she had seen him "[i]n dreads." (*Id.,* Tr. 381-82). She last observed petitioner turn right into an alley near some trucks, where he disappeared from sight. (*Id.,* Tr. 385-86).

Gilmore also apparently observed the suspect flee the scene while she was on the phone waiting for the police to arrive. Gilmore was in a nursing home at the time of petitioner's trial as a result of injuries incurred in a severe beating, which left her incapacitated; she did not testify at petitioner's trial. (*See id.,* Tr. 375-76, 519-20). However, Gilmore did assist the police at the time of the incident, providing a description of the man and the route he took to escape the scene. (*See id.,* Tr. 518-20).[7]

Cincinnati police officer Erica Brazile was the first officer to respond to the 911 call at 1:06 a.m. after receiving a dispatch around 1:03 a.m. reporting a rape. She testified that "when I got there, there were two ladies on the corner directing me towards the victim." (*Id.,* Tr. 307). Brazile discovered the victim lying on the dock, naked and "bloody all over." (*Id.*).

Cincinnati police officer Thomas Coombs and his partner, Todd Pierson, next arrived at the scene around 1:22 a.m. (*Id.,* Tr. 311). Coombs testified that based on information provided by Crawford and Gilmore, a broadcast went out describing the suspect as "[m]ale black, 30, carrying a red shirt, blue jean shorts." (*Id.,* Tr. 294). Cincinnati police officer Jennifer Luke, a homicide detective who was called from home to respond to the scene, corroborated Coombs' testimony regarding the "type of person [they] were ... looking for" from the description provided to her by Gilmore; specifically, Luke testified: "Male black, 30's, light skinned, no shirt, jeans that had fallen down or that he was ... pulling up, skinny, bald headed, buck naked." (*Id.,* Tr.

---

[7]Because Gilmore did not testify at trial, no evidence was introduced as to whether she ever specifically identified petitioner as the person she observed fleeing the scene. Apparently, during the police investigation, Gilmore was shown a photo spread which contained petitioner's picture. (*See* Doc. 11, Tr. 565). However, the only evidence elicited at trial of petitioner's identification from that photo spread pertained to eyewitness Crawford's selection of petitioner from the display shown by police. (*See id.,* Tr. 389, 430-31, 566-67); *cf. supra* p. 3 n.2.

519).

Based on the information provided by the eyewitnesses, Coombs checked the alley that the suspect was last seen entering and discovered a "pair of blue jean shorts" there. (*Id.,* Tr. 274-75). The shorts drew Coombs' attention because of the description provided to him that the "suspect was wearing blue jean shorts and he was trying to pull them up as he was running away." (*Id.,* Tr. 275). The shorts, which were found lying on the ground halfway down the alley, also did not look like they had been there very long. (*Id.,* Tr. 276, 523). A bus ticket in petitioner's name was found in a pocket of the shorts, with a credit card number on it that was traced to a Marlonda Garrett in Dayton, Ohio. (*Id.,* Tr. 485, 489, 524-25). Importantly, DNA testing on a blood stain found on the shorts revealed that the blood was from the victim. (*Id.,* Tr. 734). Testing on the "inside waist band area" of the shorts further revealed a DNA profile consistent with having come from [the victim] as well as [petitioner]." (*Id.,* Tr. 736). The "portion of the population that could not be eliminated from th[e] mixture of DNA profile ... is one person out of 967,100 Caucasian individuals, or 1 out of 452,100 African-American individuals." (*Id.,* Tr. 737).

Cincinnati police officer William Hillard, a criminalist assigned to investigate the dock where the murder occurred, testified that the victim's body was located outside a small "walled-in" alcove. (*Id.,* Tr. 448, 452). Blood was "splattered all over the back of that closed-in area," which contained a "futon mattress" and the victim's clothing. (*Id.,* Tr. 569-70; *see also id.,* Tr. 448-49). A purse was found on a ledge "in the far area" of that enclosed space. (*Id.,* Tr. 449-50). A polaroid photograph of a "nude woman," whom Hillard identified as the victim, was in the purse; there were markings on the back of the photograph. (*Id.,* Tr. 450-51). Detective Luke surmised from the "blood trail" that the stabbing attack on the victim began in the alcove, where her clothes and her other items were, and ended where she lay dead. (*Id.,* Tr. 571, 573).

Detective Luke testified that petitioner's name was run through the police department's computer system, but that the wrong person, a "John E. Long," was contacted and investigated; Luke said that eventually she was able to track petitioner down where he was incarcerated after talking with Marlonda Garrett in December 2003. (*Id.,* Tr. 524-26, 582, 598).[8]

---

[8]Luke testified that in the interim period before petitioner was located other individuals were investigated and eliminated as suspects. (Doc. 11, Ex. 22, Tr. 526-533, 585). Unlike petitioner, the other suspects who provided DNA samples were excludable from the DNA profile obtained from the waist band of the blue jean shorts. (*Id.,* Tr. 738).

14

Luke stated that petitioner was developed as a suspect at that point based on the following information that came out during her conversation with Garrett:

> [H]e had called [Garrett] on the phone asking her to send him out – get out of town, get him a bus ticket because he was scared for his life. And when he got up there, he repeatedly discussed this girl that he knew or friend of his that was killed. He spoke about it so much and the way that he spoke about it made her ask him: well, you are talking about it like you did it, and which he denied[;] and that he had brought her up a candle from the memorial and that he was acting very very odd about this girl that had been killed.

(*Id.,* Tr. 598-99). Garrett, who also testified at trial, corroborated this testimony. (*See id.,* Tr. 669-71).

Luke testified that petitioner subsequently became the "prime suspect" based on statements he made during a series of police interviews in January and February 2004. (*Id.,* Tr. 599). At the first interview held at Orient Correctional Reception Center on January 8, 2004, "buccal swabs" were taken from petitioner for DNA testing purposes. (*Id.,* Tr. 539-40). Petitioner said that he was "there that night" and "saw the crime scene tape up, so he spoke to a female black police officer." (*Id.,* Tr. 538). Petitioner also said that "people were telling him that he knows the victim," but that he thought the confusion stemmed from their both having "dreads or dreadlocks hair;" that he knew the victim had been stabbed "from word on the streets;" and that "right after this happened to this lady that he didn't know he took this as a sign from God to straighten out his life." (*Id.,* Tr. 538-39).

Cincinnati police officer Iris Kelly confirmed that petitioner had approached her in the early morning hours immediately after the murder when she was dispatched to the area to assist in "clos[ing] off the streets to any traffic" while police processed the crime scene. (*Id.,* Tr. 320-22). Kelly testified that when she was sitting in her car at her first post located at the corner of Central Avenue and Liberty Street, petitioner came up to her and started asking questions about "what happened." (*Id.,* Tr. 321-22). When Kelly asked petitioner if he knew the victim or had seen anything, petitioner walked away. (*Id.,* Tr. 323).

Kelly later moved to another post at Wade and John Streets, where petitioner approached her a second time "asking the same questions, 'Did you see her? Do you

know who she is? ... Was she with ... a man?'" (*Id.*, Tr. 324-25). Petitioner indicated in this conversation that he had seen the victim talking with a man "and knew something was wrong." (*Id.*, Tr. 325). When Kelly, who sensed petitioner knew the victim or "saw what happened," began to ask petitioner questions, petitioner "just walked away" again. (*Id.*, Tr. 325-26).

After Kelly moved to yet another post on Wade Street, petitioner approached her a third time while she was sitting in her patrol car. (*Id.*, Tr. 326). He asked the "same questions: 'Did you find out who she was? ... What was her name? Was she light skinned?'" (*Id.*, Tr. 326-27). Kelly testified: "I am, like: No, you got to tell me some information about you. You know, why do you want to know these things? And, you know, again, just walked away without any confrontation, just, you know, walked away." (*Id.*, Tr. 327).

Although Kelly stated that in hindsight she felt that petitioner "may have known more than he was letting on," at that time, Kelly did not detain petitioner or inform her supervisors about her conversations with him. (*Id.*, Tr. 343-44). Kelly reported to Detective Luke the details of her encounters with petitioner after petitioner mentioned in his initial police interview that he had spoken with a female officer at the scene. (*Id.*, Tr. 327). Kelly was then "shown a photo spread and picked [petitioner] out of [the] lineup as the individual [who] was talking to [her] that morning on three occasions at three different posts." (*Id.* & Tr. 349).

On January 20, 2004, Detective Luke reinterviewed petitioner in prison upon petitioner's request. (*Id.*, Tr. 543-44). At this second interview, petitioner told Luke that "he had remembered more since the first time" they met. (*Id.*, Tr. 545). Petitioner acknowledged that the futon mattress at the crime scene belonged to him and that he had placed a candle at the memorial site for the murder victim. (*Id.*). Petitioner said he knew Shalese Gilmore, also known as "Missy," that he had "gotten high with her in the past" and that "she was there that night." (*Id.*, Tr. 549). Petitioner also voluntarily told Luke that he had left "nylon shorts and socks on the loading dock at some point," had "masturbated ... into a napkin and threw that napkin onto the dock," and had "left food on the dock, along with ... a pornographic photo." (*Id.*, Tr. 550). Petitioner gave a number of inconsistent statements about his presence in the area the night of the homicide, and admitted that the shorts found in the alley had been given to him "one month prior to the incident and that they were his jeans." (*See id.*, Tr. 551-55).

Luke saw petitioner a third time in response to a letter from petitioner requesting another interview. (*Id.*, Tr. 557). At that meeting on February 25, 2004, petitioner told

Luke that "he wanted us to come back because he had remembered something very strange after the last interview." (*Id.*, Tr. 557-58). Luke testified as follows about the substance of her conversation with petitioner at this third meeting:

[H]e stated that he had met a guy at the youth center, which is a rehabilitation center in Dayton, and that the same guy that he met at the youth center was with him at the VOA in Cincinnati. And around dinner time on the day of the murder this guy, who he later found out or thought that he called himself Dion, Dion Montgomery ..., asked Mr. Long while they were at the VOA if he knew ... where he could find whores. Mr. Long told him that the prostitutes stood right outside of VOA. And so then after he told Mr. Montgomery this, Mr. Long snuck out the back of the VOA. He said he thought that this whole incident was strange because Mr. Montgomery had asked about whores, and then this happened, meaning the murder.

He added that the reason why I might have him involved is because he looks like Dion Montgomery and that may be why he has been identified.

(*Id.*, Tr. 558). Luke followed up with the VOA, and was told that there was no Dion Montgomery on their roster and that they had "never heard of him." (*Id.*, Tr. 559). In contrast, the people at the VOA knew petitioner well, "volunteering information" about him. (*Id.*, Tr. 610-11).

Luke showed a photo spread containing petitioner's picture to both Petrina Crawford and Shalese Gilmore, the two eyewitnesses who had observed the victim's assailant flee the crime scene. (*Id.*, Tr. 565). Previously, Crawford had been shown a couple of photo arrays containing pictures of suspects other than petitioner; Crawford did not "pick ... anybody out of those [prior arrays] as ... the [victim's] attacker." (*Id.*, Tr. 566; *see also id.*, Tr. 430-31). However, when Crawford finally was shown the photo spread containing petitioner's picture, she picked out petitioner's photograph and said she was "certain that that was the man." (*Id.*, Tr. 388, 431, 567).

Petitioner admitted, when testifying in his own defense at trial, that he was in Cincinnati "hanging in Over-the-Rhine" at the time of the victim's murder. (*Id.*, Tr. 778). He said he was "[f]or the most part ... homeless;" and that he had slept four or five times "on the dock where this crime happened," including the night before the murder. (*Id.*, Tr. 778-79, 782-85).

Finally, two correctional officers at Lebanon Correctional Institution (LeCI), where petitioner was incarcerated in early 2004, testified about their suspicions, which were triggered by petitioner's behavior and statements to them at that time. Specifically, Tia Young testified that petitioner told her he wanted to "get in touch with the detectives" because he thought he knew who murdered the victim, that he thought it "was this guy named ... Dion Montgomery." (*Id.,* Tr. 626-27). On another occasion, petitioner mentioned to Young that it was "a shame the way the lady got killed. No one should die like that. The way that she got cut up...." (*Id.,* Tr. 629). In addition, Young testified that petitioner told her "there was a picture dropped at the scene and it was a picture of a lady and on the picture Dayton, Ohio was written... And he said that the victim was [posed] in the same position as the lady on the picture." (*Id.,* Tr. 629-30). Young testified further:

> I can't remember exactly what was said, but at one point I looked at him and I said: "You killed that woman or you know who killed her."

(*Id.,* Tr. 631). Young recalled that petitioner "walked away at that particular point" in their conversation. (*Id.*).

Young contacted John Buckhalter, a corrections supervisor at LeCI, about petitioner because petitioner was "bugging" her to the point where she "basically had enough of talking to him." (*Id.,* Tr. 632-33). Young testified that she told Buckhalter "there's a guy down here and ... it seems like he is trying to confess to a murder in his own way." (*Id.,* Tr. 633). She asked Buckhalter to meet with petitioner and "see what you get out of his conversation." (*Id.*).

Buckhalter testified that he spoke privately with petitioner on February 17, 2004 about "whatever was on his mind." (*Id.,* Tr. 648-49). Petitioner ended up talking about the homicide in Cincinnati. Petitioner blamed "Dion Montgomery for the actual murder," and "rambl[ed] on about the VOA and some other things such as he had to remove some clothes that were soiled and place them in a bag and had gotten rid of them." (*Id.,* Tr. 649-51). Buckhalter stated: "And that kind of worried me." (*Id.,* Tr. 650). Buckhalter explained that petitioner's statement indicating that he had disposed of clothes from the crime scene led Buckhalter to believe "we might have ... something – it might have been a crime committed." (*Id.,* Tr. 652). Buckhalter stopped the conversation at that point and referred the matter to his supervisors, who had petitioner placed in security control pending a mental health evaluation. (*Id.,* Tr. 650, 652). Buckhalter also checked to see who "Dion Montgomery" was; he found no such person in the correctional system. (*Id.,* Tr. 651).

When viewing all this evidence in the light most favorable to the prosecution, as required by *Jackson*, the Court is convinced that a rational juror could have drawn the permissible inference that petitioner was the perpetrator of the charged murder offense. Particularly compelling were Crawford's eyewitness identification testimony; the DNA evidence obtained from the blue jean shorts, which linked petitioner to the victim's murder; evidence of petitioner's connection to the area of town and, specifically, the loading dock where the murder occurred; and petitioner's own suspicious behavior observed immediately after the murder by police officer Kelly and thereafter by Marlonda Garrett, by Detective Luke in her three interviews with petitioner, and by LeCI correctional officers. Petitioner, therefore, is not entitled to habeas corpus relief based on the claim alleged in Ground One of the petition challenging the sufficiency of evidence supporting his murder conviction.

## C. Petitioner Has Waived The Claims Alleged In Grounds Three And Six Challenging Hearsay Statements That Purportedly Were Improperly Submitted To The Jury By Way Of An Attachment To State Exhibit 38

In Grounds Three and Six of the petition, petitioner alleges that his rights under the Sixth Amendment's Confrontation Clause were violated when the trial court admitted State Exhibit 38, the photo array with petitioner's picture, into evidence because out-of-court, testimonial statements of eyewitness Shalese Gilmore were contained in an attachment to that exhibit. (Doc. 7, pp. 9, 12-c). Respondent contends in the supplemental return of writ that petitioner has waived these claims because he never raised them to the Ohio courts either on direct appeal or as an example of appellate counsel's ineffectiveness in his application for reopening of the appeal. (Doc. 29, p. 2).

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present a claim through the requisite levels of state

appellate review to the state's highest court or commits some other procedural default relied on to preclude review of the merits of such claim by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue the claim in the state courts, his claim for habeas corpus relief is subject to dismissal with prejudice on the ground that it is waived. *See O'Sullivan,* 526 U.S. at 847-848; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If, because of a procedural default, petitioner has not had a claim considered by the state's highest court and he can no longer present the claim to the state courts, he has waived such claim for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as respondent contends, petitioner committed a procedural default with respect to the claims alleged in Ground Three and Six because he failed to raise them on direct appeal or as an example of appellate counsel's ineffectiveness in the state reopening proceedings. Petitioner did allege in the reopening proceedings that a claim should have been presented on direct appeal challenging trial counsel's conduct in failing to object to "inadmissible hearsay statements that were contained in State's Exhibit 38." (*See* Doc. 11, Ex. 9, p. 7 & Ex. 16, p. 10).[9] However, petitioner did not

---

[9]It is noted that petitioner has not alleged herein, as he did in his state reopening application, that his trial counsel was ineffective in failing to object to the admission of State Exhibit 38. (*See* Doc. 7, p. 12-b). However, even assuming such a claim had been raised for consideration by this Court, petitioner has not met his burden of showing that Gilmore's hearsay statements were in fact attached to that exhibit when it was presented at trial. Petitioner has expanded the record to include "Trial Exhibit #38 *as it was given to the defense during discovery.*" (Doc. 19) (emphasis added). Attached to the exhibit provided by petitioner are the police officers' summaries of various witnesses responses to the photographic "line up," including Gilmore's response. In contrast, it appears that at trial only the "photo spread" was marked and admitted into evidence as State Exhibit 38. (*See* Doc. 11, Ex. 22, Exhibits List & Tr. 389, 565-67, 754-55). The fact that "lines" in the array photographs taken by law enforcement officials were not redacted from the trial exhibit does not even remotely suggest, as petitioner has argued, that the summaries of witnesses' responses to the line-up remained attached to that exhibit. Therefore, contrary to petitioner's contention, it appears from the record that no hearsay statements were improperly submitted to the jury by way of State Exhibit 38.

assert as alleged in Grounds Three and Six that his appellate counsel should have raised a claim that the trial court committed "plain error" in admitting the exhibit into evidence.

Accordingly, the undersigned concludes that the claims alleged in Grounds Three and Six are barred from review absent a showing of cause and prejudice for the default or that a fundamental miscarriage of justice will occur if the claims are not considered herein. No such showing has been made in this case. Therefore, petitioner is not entitled to habeas relief based on such claims, which are deemed waived.

## D. Petitioner Procedurally Defaulted The Claims Alleged In Grounds Four And Five And Is Not Entitled To Relief Or Review Of The Barred Claims Based On The Ineffective Assistance Of Appellate Counsel Claim Alleged In Ground Two And As "Cause" For His Procedural Default

In Ground Four of the petition, petitioner alleges that his Sixth Amendment right to confront the witnesses against him was violated by the admission of Shalese Gilmore's hearsay statements through the trial testimony of Cincinnati police officers Thomas Coombs and Jennifer Luke. (Doc. 7, p. 11). In Ground Five of the petition, petitioner alleges that his trial counsel was ineffective in failing to object to "inadmissible 'other acts' evidence and improper impeachment evidence ... elicited by the State ... during trial." (*Id.,* p. 12-b). In Ground Two of the petition, petitioner alleges that his appellate counsel was ineffective in failing to assert the claims alleged in Grounds Four and Five, as well as other claims, as assignments of error on direct appeal. (*Id.,* pp. 7, 7-a).

Petitioner raised these three claims for the first time in his application for reopening of the appeal, which was denied by the Ohio Court of Appeals on procedural *res judicata* grounds. (*See* Doc. 11, Exs. 9, 11, 14, 15). Petitioner exhausted the claims by reasserting them on further appeal to the Ohio Supreme Court; however, that court did not address the claims on the merits, but instead summarily dismissed the appeal "as not involving any substantial constitutional question." (*See id.,* Exs. 16, 17).

In the return of writ and supplemental return of writ, respondent contends that petitioner has waived the claims alleged in Grounds Four and Five due to his procedural default in failing to present those claims as independent assignments of error on direct appeal, which was relied on by the Ohio courts in denying his application for reopening of the appeal. (*See* Doc. 11, Brief, pp. 18-19; Doc. 29, p. 2). Respondent further argues in the supplemental return of writ that petitioner neither can demonstrate "cause" for his

procedural default of the claims alleged in Grounds Four and Five nor is independently entitled to relief based on the ineffective assistance of appellate counsel claim alleged in Ground Two of the petition, which is subject to review on the merits. (Doc. 29, pp. 3-18).

As an initial matter, as respondent has argued, petitioner committed a procedural default with respect to the record-based claims of constitutional trial error, which are alleged in Grounds Four and Five of the petition. Pursuant to Ohio R. App. P. 26(B), these claims could not serve as independent justifications for reopening the appeal but rather only as examples of appellate counsel's ineffectiveness in the reopening application. In any event, the state procedural *res judicata* rule relied on by the Ohio Court of Appeals in denying the reopening application constituted an adequate and independent ground with respect to those claims, because they could have been asserted as assignments of error on direct appeal. *Cf. Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007) ("In Ohio, res judicata has long been held to bar consideration of constitutional claims in post-conviction proceedings ... when those claims have already been or could have been fully litigated either before judgment or on direct appeal from that judgment.") (quoting *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir. 2002)), *cert. denied,* 128 S.Ct. 2971 (2008); *see also Williams v. Bagley,* 380 F.3d 932, 966-67 (6th Cir. 2004) (and numerous Sixth Circuit cases cited therein), *cert. denied,* 544 U.S. 1003 (2005).[10]

However, in Ground Two of the petition, which is subject to review on the merits (*see* Doc. 18), petitioner has alleged that his appellate counsel's ineffectiveness constitutes "cause" for his procedural default in failing to raise the claims alleged in Grounds Four and Five, as well as other claims, on direct appeal. It is well-settled that appellate counsel's ineffectiveness may amount to "cause" for a procedural default occurring, as claimed here, in an appeal as of right to the Ohio Court of Appeals. *See Murray v. Carrier,* 477 U.S. 478, 488 (1986); *see also Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Burroughs v. Makowski,* 411 F.3d 665, 668 (6th Cir.) (per curiam), *cert. denied,* 546 U.S. 1017 (2005). Therefore, the undersigned will proceed to address the ineffective assistance of appellate counsel claim alleged in Ground Two to the extent it has been asserted both as an independent ground for relief and as "cause" for petitioner's procedural default of Grounds Four and Five.

Petitioner's ineffective assistance of counsel claim is subject to review under the two-part standard established by the Supreme Court in *Strickland v. Washington,* 466

---

[10]*See generally Harris v. Reed,* 489 U.S. 255, 260-63 (1989).

U.S. 668 (1984). To establish entitlement to relief under *Strickland*, petitioner must demonstrate both (1) his attorney on direct appeal made such serious errors that she was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* test, petitioner must show that appellate counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time the conduct occurred. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.*

Appellate counsel is not constitutionally ineffective under this prong merely because she declines to raise a non-frivolous issue on appeal that was requested by the defendant. *Sharp v. Puckett*, 930 F.2d 450, 452 (5th Cir. 1991) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that an "indigent defendant [does not have] a constitutional right to compel appointed counsel to press nonfrivolous points [on appeal] requested by the client")); *see also Johnico v. Chrones*, 187 Fed.Appx. 701, 703 (9th Cir. June 9, 2006) (not published in Federal Reporter) ("Appellate counsel has no duty to raise every single issue requested by a defendant."), *cert. denied*, 549 U.S. 1037 (2006). As the Supreme Court stated in *Barnes*, 463 U.S. at 754:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy.... Nothing in the Constitution or our interpretation of that document requires such a standard.

"Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (quoting *Barnes*, 463 U.S. at 751-52); *see also Coleman v. Mitchell*, 268 F.3d 417, 430-31 (6th Cir. 2001), *cert. denied*, 535 U.S. 1031 (2002). It is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim on direct appeal; however, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins*, 528 U.S. 259, 288

(2000) (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)); *see also Wilson v. Hurley,* 108 Fed.Appx. 375, 379 (6th Cir. Aug. 30, 2004) (not published in Federal Reporter), *cert. denied,* 543 U.S. 1160 (2005).

To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsel's errors, the result of the direct appeal proceeding would have been different. *See Strickland,* 466 U.S. at 694. Petitioner has met his burden if he shows that the result of the appeal would "reasonably likely have been different absent the errors." *Id.* at 695.

The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *Id.* at 697.

Here, the undersigned has reviewed the record and has addressed each of the claims that petitioner contends his counsel should have raised on direct appeal. *See infra* pp. 24-31. For the reasons given below in rejecting those claims, the undersigned concludes that petitioner has not demonstrated that his appellate counsel's representation was constitutionally ineffective under either prong of the *Strickland* test.

## 1. Ground Four: Confrontation Clause Claim.

In the reopening proceedings, petitioner claimed that his appellate counsel was ineffective in failing to raise a claim challenging the admission of certain hearsay statements made by Shalese Gilmore, which came out during the testimony of Cincinnati police officers Thomas Coombs and Jennifer Luke. (*See* Doc. 11, Ex. 9, pp. 3-6). Specifically, petitioner challenged the propriety of the officers' testimony that Gilmore had told them that she saw the perpetrator "pulling up blue jean shorts" while running from the crime scene. (*Id.,* p. 5). The same claim has been alleged in Ground Four of the instant petition. (Doc. 7, p. 11).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington,* 541 U.S. 36, 51, 53-54 (2004), the Supreme Court held that this provision, which is applicable "to 'witnesses' against the accused–in other words those who 'bear testimony,'" bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify

and the defendant had had a prior opportunity for cross-examination." Although the *Crawford* Court refused to "definitively resolve" whether the Confrontation Clause applies outside the context of "testimonial statements," *see id.* at 61, in a later case, the Court expressly held that the Confrontation Clause applies only to testimonial hearsay. *Davis v. Washington,* 547 U.S. 813, 821, 823-34 (2006).

The *Davis* Court explained: "Only [testimonial] statements ... cause the declarant to be a "witness" within the meaning of the Confrontation Clause." *Id.* at 821. The Court pointed out that the "answer to the ... question was suggested in *Crawford,* even if not explicitly held," as the Court in *Crawford* emphasized that the "text of the Confrontation Clause reflects this focus [on testimonial hearsay]." *Id.* at 823 (quoting *Crawford,* 541 U.S. at 51). The *Davis* Court reasoned: "A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark not merely its 'core,' but its perimeter." *Id.* at 824; *cf. Whorton v. Bockting,* 549 U.S. 406, 420 (2007) (pointing out "*Crawford*'s elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements").[11]

In addition, the "admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. Instead, the statement must be used as hearsay–in other words, it must be offered for the truth of the matter asserted." *United States v. Pugh,* 405 F.3d 390, 399 (6th Cir. 2005) (citing *United States v. Cromer,* 389 F.3d 662, 676 (6th Cir. 2004)). Therefore, petitioner could not prevail on any Confrontation Clause claim stemming from the admission of Shalese Gilmore's out-of-court statements to Coombs and Luke unless those statements were "testimonial in nature" and were offered as hearsay to prove that petitioner was the perpetrator of the murder offense. *See id.*

In this case, a strong argument can be made that Gilmore's statements to police officers Coombs and Luke at the crime scene about seeing petitioner "pulling up blue jean shorts" were not testimonial in nature. In *Davis,* 547 U.S. at 822, the Court held:

> Statements are nontestimonial when made in the course of police

---

[11]*See also United States v. Washington,* 498 F.3d 225, 229 (4th Cir. 2007), *petition for cert. filed,* No. 07-8291 (U.S. Dec. 14, 2007); *United States v. Feliz,* 467 F.3d 227, 231 (2nd Cir. 2006) ("The Supreme Court ... in *Davis* made it clear that the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements."), *cert. denied,* 549 U.S. 1238 (2007); *United States v. Ellis,* 460 F.3d 920, 923 (7th Cir. 2006); *Ware v. Henry,* No. 06cv10553-DT, 2008 WL 1808326, at *8 (E.D. Mich. Apr. 21, 2008) (unpublished).

interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing police emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution.

In the case-at-hand, the description provided by Gilmore to the police officers at the scene was to assist the police in meeting an ongoing police emergency; at that time, the murder had just occurred, and in fact had been reported as a "rape in progress," and the police were trying to apprehend the perpetrator before he could flee the vicinity. The blue jean shorts were found in the alley *after* Gilmore relayed her description of the perpetrator to the police; moreover, the shorts did not gain evidentiary significance until *after* the DNA test results came back establishing a link between the victim, whose blood was on the shorts, and petitioner. The statements were not obtained to establish or prove *past* events potentially relevant to petitioner's prosecution, or for the purpose of preparing a case for trial, but to provide a description of the perpetrator for radio broadcast to assist police in the area in finding him before he could make good his escape. *Cf. United States v. Arnold*, 486 F.3d 177, 190-91 (6th Cir. 2007) (a witness's "on-the-scene statements in response to officers' questions" were not testimonial where "[n]either the brief interval of time after the 911 call nor the arrival of the officers ended the emergency," and the perpetrator "remained at large," possibly armed in the "nearby vicinity"), *cert. denied,* 128 S.Ct. 871 (2008).[12]

In any event, it is clear from the record that the statements were not hearsay offered to establish that petitioner committed the murder, but to explain the police officers' actions in response to those statements–specifically, the description of the perpetrator that was broadcast out to police in the area, and why the officers' attention was drawn to the shorts discovered in the alley used as an escape route by the perpetrator. Indeed, during Coombs' testimony, the trial court expressly advised the jury that "what is being offered by these witnesses is not being admitted for the truth of what is contained in their statement, but it is being admitted solely as to why this officer reacted in the manner that he did. So do not accept as evidence what is contained in the statement, but why the officer reacted to the statement." (Doc. 11, Ex.

_____

[12]*Contrast Davis,* 547 U.S. at 819-20, 829-30 (holding that statements made in an on-the-scene interrogation of the witness in a domestic violence situation were testimonial where there was no emergency in progress and the officer expressly acknowledged that he was asking questions about "possibly criminal past conduct").

22, Tr. 273). Moreover, during Luke's testimony, the prosecutor only asked "what type of person [Luke] was looking for" after speaking to Gilmore and other witnesses. (*Id.,* Tr. 518-19). When Luke mentioned at one point that she "was told that he was buck naked and may have fallen while pulling up jeans," defense counsel immediately objected "to what she was told;" the trial court sustained the objection and instructed the jury "to disregard the officer's last comments...." (*Id.,* Tr. 523-24).

No evidence was admitted at trial that Gilmore actually identified petitioner as the perpetrator of the offense; nor did the prosecutor rely on Gilmore's description of the man she had observed running from the scene as evidence of petitioner's guilt in closing arguments. (*See id.,* Tr. 870-881, 908-25). Rather, the prosecutor relied on eyewitness Petrina Crawford's identification of petitioner and the DNA evidence obtained from the shorts found in the alley; specifically, when referring to the shorts, the prosecutor did not mention the description provided by Gilmore, but argued only that the "killer was on that dock, and he must have either been wearing these jeans or carrying these jeans, because it was her blood on the jeans," and that "[t]here are only two people's DNA on those jeans, Amerrintha Spikes [and] John Long." (*Id.,* Tr. 878-79).

Finally, even assuming the challenged testimony triggers Confrontation Clause concerns, only harmless error occurred. *See Hawkins v. Ganshimer,* 286 Fed.Appx. 896, 902 (6th Cir. 2008) (not published in Federal Reporter) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986), and *Chapman v. California,* 386 U.S. 18, 21-22 (1967)) ("Confrontation Clause errors are subject to harmless-error analysis."). It is unlikely that Gilmore's observation of a man pulling up blue jean shorts while fleeing the scene had a substantial effect on the jury's verdict given the other overwhelming evidence of petitioner's guilt, discussed above in addressing petitioner's sufficiency of evidence claim. *See supra* p. 19.

Accordingly, the undersigned concludes that petitioner would not have prevailed on the Confrontation Clause claim alleged in Ground Four of the petition if it had been asserted as an assignment of error on direct appeal. Petitioner's appellate counsel, therefore, was not ineffective in failing to raise it as a claim for consideration by the Ohio courts on direct appeal.

## 2. Ground Five: Ineffective Assistance Of Trial Counsel–"Other Acts" Evidence.

In the reopening proceedings, petitioner alleged that his appellate counsel was ineffective because she did not raise an ineffective assistance of trial counsel claim

27

stemming from trial counsel's failure to object to improper "other acts" evidence. *(See* Doc. 11, Exs. 11, 14). The same claim has been alleged in Ground Five of the instant petition. (Doc. 7, p. 12-b).

Petitioner has not provided any specific examples of improperly admitted "other acts" evidence in the instant federal habeas petition or in his briefs in reply to the return of writ and supplemental return of writ. The undersigned has reviewed each of the transcript citations provided by petitioner in support of the claim raised in the reopening proceeding, which are set forth in his "Additional Memorandum In Support of Application To Reopen." *(See* Doc. 11, Ex. 14). However, none of these citations trigger any concerns of prejudicial error that defense counsel should have objected to at trial.

First, petitioner has cited references made to a pornographic photograph and other incriminatory items found at the crime scene; petitioner's arrest for the instant murder offense; and petitioner's interactions with State witnesses Iris Kelly, Marlonda Garrett and Tia Young. *(See id.,* Ex. 22, Tr. 550, 671, 668, 919-21). These references, involving evidence discovered at the scene, the witnesses' observations of petitioner's behavior or inferences that could be drawn from petitioner's interactions with certain witnesses, pertain to the instant case only. They do not amount to "other acts" evidence.

Second, petitioner has cited additional references, which were not improper because they essentially relayed information that petitioner himself provided in statements to the police, to correctional officers, and at trial about a knife taken from him on his arrest for a parole violation; his "repeating the same behavior;" and his activities on the day of the murder, which included stealing and drug use. *(See id.,* Tr. 240, 547-48, 553, 561, 630-31, 668, 850-51).

Third, petitioner challenges references to petitioner's incarceration for a probation or parole violation after the murder and to his interviews with police officer Luke at the jail before his arrest on the murder charge. *(Id.,* Tr. 240, 536, 543-44, 548, 561, 668). Although these references imply that petitioner had a criminal history, they do not constitute "other acts" evidence but merely amount to a statement of fact about petitioner's place of residence when he was finally located and interviewed by the police as a suspect for Amerrintha Spikes' murder.

Finally, petitioner testified in his own defense at trial; he admitted that he was a drug user with a prior criminal record and that on his release from prison in May 2003 to a half-way house, he "relapsed" and left the half-way house in violation of his parole.

(*See id.,* Tr. 244-45, 767-82). By taking the stand, petitioner was subject to cross-examination, which included impeachment by prior convictions. *See, e.g., Ohler v. United States,* 529 U.S. 753, 757 (2000); *see also Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272, 287 (1998) ("A defendant who takes the stand in his own behalf may be impeached by proof of prior convictions without violation of the Fifth Amendment privilege."); *Grunewald v. United States,* 353 U.S. 391, 420 (1957) ("[W]hen a criminal defendant takes the stand, he ... becomes subject to cross-examination impeaching his credibility just like any other witness."); *Vasquez v. Jones,* 496 F.3d 564, 571 (6th Cir. 2007).

The State, therefore, was allowed to cross-examine petitioner about his prior criminal record to impeach his credibility, particularly given that petitioner did not give a full account of his prior convictions on direct examination. (*See* Doc. 11, Ex. 22, Tr. 833-38). In addition, it was permissible for the State to refer on cross-examination to petitioner's drug use and stealing as a possible scenario for the homicide, in light of petitioner's testimony on direct examination that he did not know the murder victim and was not present at the crime scene at the time of the offense, but was out selling batteries that he had stolen and then on his way to buy drugs when he learned of the homicide. (*See id.,* Tr. 855-59).

Petitioner cites a couple of more passing references made by the prosecutor in closing argument to petitioner's "stealing daily," and use of drugs "to the point of dominating his life." (*Id.,* Tr. 880-81, 923). However, even assuming these remarks were improper, it is highly unlikely that they had any impact on the jury's verdict.

The trial court explicitly instructed the jury that the "opening statements and closing arguments of counsel are designed to assist you" and "are not evidence." (*Id.,* Tr. 928). The court also gave the following limiting instruction about the weight to be accorded prior conviction evidence:

> Evidence was received that one or more witnesses in this case had a previous conviction for a crime. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the witness in order to show that he or she acted in conformity with that character. If you find that the witness was previously convicted, you may consider that evidence only for the purpose of testing the witness's credibility and the weight to be given to his or her testimony. It may not be considered for any other purpose.

(*Id.,* Tr. 931-32).

Accordingly, upon review of the entire record, the undersigned is convinced that petitioner's claim of prejudicial error stemming from the admission of "other acts" evidence is meritless. Petitioner's appellate counsel, therefore, was not ineffective in failing to raise such claim as an assignment of error on direct appeal.

### 3. Ground Two: Remaining Ineffective Assistance of Appellate Counsel Claims.

In Ground Two of the petition, petitioner additionally contends that his appellate counsel should have presented claims on direct appeal challenging trial counsel's failure to object to the admission of State Exhibits 38 and 44; the trial court's error in admitting State Exhibit 35 over defense counsel's objection; and the fairness of the trial based on "cumulative error." (Doc. 7, p. 7-a). None of these claims have any merit.

First, as noted above, *see supra* p. 20 n.9, petitioner has not demonstrated that State Exhibit 38, the photographic array with petitioner's picture, contained any improper hearsay material. Defense counsel did not object to the "lines" remaining in the photographs, because the jury already knew petitioner had a criminal record. State Exhibit 44 was a crack pipe that was found at the scene near the victim's body. Although the item was properly admitted as relevant for showing the context in which the murder may have occurred, it did not have significant evidentiary value and was not relied on by the State to establish petitioner's guilt. Therefore, it is highly unlikely that any error in admitting this item into evidence prejudicially impacted the jury's verdict. Because it thus appears that State Exhibits 38 and 44 were properly admitted and were not prejudicial, trial counsel's failure to object to the admission of these exhibits did not amount to ineffective assistance.

Second, it is highly unlikely that the admission of State Exhibit 35 amounted to anything more than minimal error. State Exhibit 35 was the nude polaroid photograph of the victim that was found in the victim's purse at the crime scene. The photograph was relevant to the extent petitioner talked about it with Jennifer Luke and Tia Young, and his statements may have played a part in their developing concern about his possible involvement in the crime. (*See* Doc. 11, Ex. 22, Tr. 550, 629-30). However, unlike Petrina Crawford's identification of petitioner and the blue jean shorts, as well as petitioner's own inculpatory conduct after the murder, the photograph did not constitute strong evidence connecting petitioner with the victim's homicide. Therefore, even assuming the photograph was improperly admitted into evidence, which is highly doubtful, the error had little if any impact on the jury's verdict.

Finally, because this Court has determined that petitioner is not entitled to relief based on any of his individual claims of trial error, his claim that he was denied a fair trial as a result of "cumulative error" lacks merit. Certainly, petitioner is unable to obtain federal habeas relief based on such a claim. *See, e.g., Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."); *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005) ("constitutional errors that would not individually support habeas relief can[not] be cumulated to support habeas relief"), *cert. denied,* 549 U.S. 1027 (2006); *see also Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.), *corrected on denial of rehearing,* 307 F.3d 459 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003)), *cert. denied,* 537 U.S. 1192 (2003). Even assuming petitioner could obtain relief from the state courts for "cumulative error," the undersigned concludes that petitioner's claims do not individually or cumulatively amount to a due process violation or otherwise constitute prejudicial error.

Accordingly, in sum, because petitioner's remaining claims of error in the trial proceedings lack merit, petitioner's appellate counsel was not ineffective in failing to present them as assignments of error on direct appeal.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's motion to amend the petition to add two more claims as grounds for relief (Doc. 22) be **DENIED**.

2.. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 7) be **DENIED** with prejudice.

3. A certificate of appealability should not issue with respect to any Order adopting the Report and Recommendation to deny petitioner's motion to amend the petition to add two more claims, which this Court has concluded are procedurally barred from review, because under the first prong of the two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[13]

---

[13]Because this Court finds the first prong of the *Slack* standard has not been met in this case, it need not address the second prong of *Slack* as to whether or not "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in either of the grounds he seeks to add as claims for habeas relief. *See Slack,* 529 U.S. at 484.

A certificate of appealability also should not issue with respect to the claims alleged in Grounds Three through Six of the petition, which this Court has concluded are waived and thus procedurally barred from review, because under the two-prong standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural rulings or whether petitioner has stated a viable constitutional claim in any of these grounds for relief.

Finally, a certificate of appealability should not issue with respect to the claims alleged in Grounds One and Two of the petition, which have been addressed on the merits herein, because petitioner has not made a substantial showing of a "viable claim of the denial of a constitutional right" or that the issues presented in those grounds for relief are "adequate to deserve encouragement to proceed further." *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

4. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 5/12/09

cbc

Timothy S. Hogan
United States Magistrate Judge

J:\BRYANCC\2009 habeas orders\06-787deny-amd-SOLrelback.denypet.sufficevid-murder.waiv-iaac.iac.confrontel-hearsay.wpd

32

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

John William Long,
    Petitioner

    vs                                 Case No. 1:06cv787
                                        (Barrett, J.; Hogan, M.J.)

Warden, Warren Correctional
Institution,
    Respondent

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action. Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b). A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X ☑ Agent ☐ Addressee <br> B. Received by ( *Printed Name* )    C. Date of Delivery |
| 1. Article Addressed to: <br><br> John W Long #478-899 <br> Warren Corr. Inst. <br> P.O. Box 120 <br> Lebanon, OH 45036 | D. Is delivery address different from item 1? ☐ Yes <br> If YES, enter delivery address below: ☐ No <br><br> 3. Service Type <br> ☑ Certified Mail   ☐ Express Mail <br> ☐ Registered   ☐ Return Receipt for Merchandise <br> ☐ Insured Mail   ☐ C.O.D. <br> 4. Restricted Delivery? *(Extra Fee)*   ☐ Yes |
| 2. Article Number <br> *(Transfer from service label)*    7002 3150 0000 8388 4933 | |

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509

1:06 cv 787  (Doc. 34)